TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-11-00213-CR

NO. 03-11-00214-CR

NO. 03-11-00215-CR

NO. 03-11-00216-CR

NO. 03-11-00217-CR






John Niess, Appellant


v.


The State of Texas, Appellee






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 390TH JUDICIAL DISTRICT

NOS. D-1-DC-10-202183, D-1-DC-10-202185, D-1-DC-10-202186, D-1-DC-10-500216,

D-1-DC-10-900336, HONORABLE JULIE H. KOCUREK, JUDGE PRESIDING





M E M O R A N D U M O P I N I O N


 Appellant John Niess was indicted in five causes for thirteen counts of aggravated
robbery with a deadly weapon. See Tex. Penal Code Ann. § 29.03 (West 2011). The five causes
were consolidated for a single jury trial. At trial, the trial court granted defendant's motion for
instructed verdict as to one of the counts, and the jury found Niess guilty of the remaining twelve
counts. After Niess pleaded true to enhancement allegations, the jury assessed punishment at thirty
years' imprisonment for each count, with the sentences to be served concurrently. On appeal, Niess
argues that the trial court (1) erred in admitting evidence of an impermissibly suggestive pretrial
photo identification procedure, (2) erred in admitting in-court identification testimony, tainted by
the impermissibly suggestive pretrial photo identification procedure, and (3) abused its discretion
in refusing to grant a mistrial due to the introduction of highly prejudicial testimony concerning
Niess's criminal history. Further, Niess argues one of the judgments of conviction fails to reflect
that he was acquitted of one of the counts for which he was charged, and he requests that we modify
this judgment to correct the error. (1) We modify the trial court's judgment of conviction as requested,
and affirm that judgment as modified; we also affirm the remaining judgments of conviction.


BACKGROUND


 Early on the morning of April 17, 2010, Niess, his brother Frank Niess, and Frank's
then girlfriend, Erin Moody, went to the home of Steve Rodriguez and Servando Rodriguez. (2) While
there, Frank informed Erin that the four men were leaving in her pickup truck to "hit some
licks." (3)  Sometime between 2:30 and 3:00 a.m., the four men left in Erin's truck, a red Ford F-150
with tinted windows and a black bar across the back window. Erin, along with Steve's girlfriend,
stayed at the house.

 Between 4:00 and 6:00 a.m. that same morning, law enforcement authorities began
receiving numerous reports of robberies involving a red pickup truck in the Austin area. First, at
4:12 a.m., the Austin Police Department (APD) responded to a call from Naomi Garcia and her
cousin, Leigh Carillo. Naomi and Leigh had left a local nightclub around 3:00 a.m. and driven to
the apartment complex of Naomi's friend, Ramiro Garcia. For about an hour, Naomi and Leigh,
along with Ramiro, remained in the parking lot of the apartment complex. Leigh was inside the car
listening to music and Naomi and Ramiro were outside the car socializing when, according to
Naomi, a man wielding a shotgun approached her and Ramiro. The man then put the gun to Naomi's
rib, hit her twice, and ordered her and Ramiro to the ground. Once Ramiro and Naomi were on the
ground, a second man opened the car door with Leigh still inside. At knife point, he took Leigh's
purse and necklace before pulling her out of the car and dragging her to Naomi and Ramiro. The
assailants proceeded to tear Naomi's stereo from the car before leaving in a vehicle that Leigh later
described at trial as a red SUV with tinted windows. Leigh also testified that there were four
assailants in total, and she described the man with the shotgun as heavyset and tall, wearing a red
shirt, black shorts, and a red bandana on his face. Once Naomi and Leigh were certain that the men
were gone, Naomi and Leigh left the complex and called 9-1-1.

 That same early morning, three teenage boys, Enemencio Alaniz, Tyshun Guzman,
and Nick Barrientez, were walking home from a fast food restaurant when a truck pulled up beside
them. At trial, the boys described the truck as a red, four-door Ford with tinted windows and a bar
on the back. According to the boys, a heavyset man with short-cropped hair and a red shirt was sitting
in the passenger seat. The man asked the boys if they had any "good," which the boys understood
to mean marijuana. When the boys answered that they did not, the same man told one of the
teenagers, Enemencio, to "come here." When Enemencio refused, the man pointed a shotgun at
him through the window, cocked it, and threatened to kill him if he did not comply. The man then
ordered two men in the back seat to get out of the truck. The two men complied and, as they exited
the truck, inadvertently dropped some papers with Leigh Carillo's name on them, which were later
recovered by police. The men proceeded to rob the three teenage boys. The boys escaped by telling
the men that they saw police coming and, when the assailants looked in that direction, ran home.
The boys called the police at 4:57 a.m.

 That same morning, Santos Valle and his cousin Miguel Vasquez were standing
outside their house talking with their neighbor, Joe Lopez. Joe's friend June Aguilar was in her
car outside the house. Sometime between 4:00 and 4:30 a.m., a red Ford pickup truck, with tinted
windows and black bar on the back window, drove up and stopped near where the friends were
congregating. Three of four men in the truck got out, and the man who got out of the passenger
seat was holding a shotgun. Santos managed to escape while the assailants were distracted and ran
to his house and called 9-1-1. Meanwhile, the assailants forced Joe to the ground and took his
jewelry and cell phone. The man with the shotgun forced June out of her car but did not take her
belongings. Another assailant patted down Miguel, who had just returned from his job as a security
guard, and took several of his belongings, including his handcuffs, pepper spray, radio, wallet, and
badge. The assailants then returned to the truck and drove away. The police were called at 4:41 a.m.

 At 5:40 a.m. Travis County Deputy Sheriff Steven Coleman was dispatched to an
Austin nightclub. Michael Bishop had been sitting in his car outside the club waiting for his girlfriend
to get off work, when a man opened the car's driver door and shoved a shotgun in Bishop's face.
The man, who was not wearing anything to cover his face, took Michael's phone, wallet, and some
cash from his pocket. A second man wearing a bandana over his face then entered Michael's car
through the passenger door and looked for items to take. According to Michael, he noticed a red
four-door pickup truck pulled up behind his car with two other men inside, one of whom was
shouting for the assailants to hurry. The assailants left in the truck, taking Michael's wallet, keys,
cell phone, and lighter. Once they were gone, Michael went inside the club and asked an employee
to call 9-1-1. Once Deputy Coleman arrived at the scene, he requested that an emergency "ping"
be placed on Michael's stolen phone. (4)

 Finally, at 5:58 a.m. APD received a call reporting another robbery. Eduardo Arpero
and his cousin, Raando Arpero, had arrived at their jobs at Ginny's Printing shortly before 6:00 a.m.
According to Eduardo and Raando, they had just parked and exited their truck when a four-door,
Ford pickup truck pulled up behind them. Four men, all wearing masks or bandanas on their faces,
were inside the truck. One of the men, who was wearing a red shirt, jumped out of the truck with
a shotgun and held it to Raando's head, while telling Raando and Eduardo to get to the ground.
Meanwhile two other men opened Eduardo's truck, taking his stereo, keys, and phone. One of the
assailants then handcuffed Raando and took his wallet. The handcuffs were later identified by Miguel
as looking like the handcuffs that had been taken from him earlier that night. Police also located
Michael's wallet near the print shop.

 Niess, Frank, Steve, and Servando did not return to the Rodriguez house that morning
until after 6:00 a.m. Having located the house through the emergency "ping" on Michael's phone,
the police arrived at the house shortly after the group of men returned. The police found Erin's red
truck parked outside the house and noticed that the hood was still warm. A SWAT team surrounded
the residence, and the group of four men and two women, including Niess, soon came out of the
house. Police subsequently found a red shirt and bandana outside of the house. Police also found
items belonging to the victims inside the house and truck, including Miguel's pepper spray, duty
belt, bulletproof vest, and radio. Niess was arrested and charged with thirteen counts of aggravated
robbery in five separate causes.


DISCUSSION

Pretrial Identification

 Prior to trial, Niess filed a motion to suppress evidence of a pretrial photo identification
procedure prepared and conducted by the APD. (5) The trial court denied the motion, and at trial six
witnesses testified that they had picked Niess out of the photo array. Similarly, five of the victims
identified Niess in the courtroom as one of the assailants, after previously identifying him in the
photo array. In his first issue, Niess contends that the trial court abused its discretion by admitting
evidence of an impermissibly suggestive pretrial photographic identification procedure. Similarly,
in his second issue, Niess argues that the in-court identifications of him by five witnesses were
"tainted by the impermissibly suggestive photographic spread which gave rise to a substantial
likelihood of misidentification at trial."

 On appeal, we review a trial court's ruling on a motion to suppress evidence based on
a claim that an impermissibly suggestive pretrial identification procedure violated the defendant's
due process rights under the standard of review set forth in Guzman v. State, 955 S.W.2d 85 (Tex.
Crim App. 1997). See Loserth v. State, 963 S.W.2d 770, 771 (Tex. Crim. App. 1998). Under this
standard, we afford almost total deference to a trial court's determination of facts, especially
when the trial court's findings are based on an evaluation of credibility and demeanor. Guzman,
955 S.W.2d at 89; Moore v. State, 140 S.W.3d 720, 730 (Tex. App.--Austin 2004, pet. ref'd). We
afford the same deference to a trial court's determination of mixed questions of law and fact if the
resolution of those ultimate questions turns on an examination of credibility and demeanor of the
witness. Guzman, 955 S.W.2d at 89. However, a trial court's determination of mixed questions of
law and fact that do not turn on credibility and demeanor are reviewed de novo. Id.

 A pretrial identification may not be so suggestive and conducive to mistaken
identification that subsequent use of that pretrial identification at trial would deny the accused due
process of law. Barley v. State, 906 S.W.2d 27, 32-33 (Tex. Crim. App. 1995) (citing Stovall v.
Denno, 388 U.S. 293 (1967)). Similarly, an in-court identification is inadmissible when it has been
tainted by an impermissibly suggestive pretrial photographic identification. Luna v. State, 268
S.W.3d 594, 605 (Tex. Crim. App. 2008). The test for determining if a pretrial identification
procedure is impermissibly suggestive is whether, considering the totality of the circumstances, "the
photographic identification procedure was so impermissibly suggestive as to give rise to a very
substantial likelihood of irreparable misidentification." Id. This is a mixed question of law and fact
that does not turn on an evaluation of credibility and demeanor. Loserth, 963 S.W.2d at 773.
Accordingly, we apply a de novo standard of review. Id.

 To determine the admissibility of both pretrial identification and potentially tainted
in-court identification we employ a two-step analysis: (1) whether the pretrial identification procedure
was impermissibly suggestive; and, if so, (2) whether that suggestive procedure gave rise to a very
substantial likelihood of irreparable misidentification. Barley, 906 S.W.2d at 33. The defendant
must prove both elements by clear and convincing evidence. Id. at 33-34. Only if we determine that
the pretrial identification procedure is impermissibly suggestive do we examine whether it tainted
the in-court identification. Id. at 34.

 With regard to the first prong, it is well established that suggestiveness may arise
from the manner in which the pretrial identification procedure is conducted or from the content of
the resulting photo array itself. Id. at 33. Suggestiveness may arise from the manner in which the
pre-trial identification is conducted if, for example, police point out the suspect or suggest that a
suspect is included in the photo array. Id. Whereas, the resulting photo array itself is considered
unduly suggestive if, for example, other participants are greatly dissimilar in appearance from the
suspect. Withers v. State, 902 S.W.2d 122, 125 (Tex. App.--Houston [1st Dist.] 1995, pet. ref'd)
(citing United States v. Wade, 388 U.S. 218, 232-33 (1967)). However, "neither due process nor
common sense requires" that the other pictures used in a photographic array exactly match
the defendant's characteristics. Turner v. State, 600 S.W.2d 927, 933 (Tex. Crim. App. 1980).
Rather, the array must show individuals who fit a rough description of the suspect. Wilson v. State,
15 S.W.3d 544, 553 (Tex. App.--Dallas 1999, pet. ref'd). In this case, Niess claims that the photo
array was suggestive in both content and the manner in which it was conducted.

 We first examine whether the manner in which pretrial identification procedure was
conducted in this case was impermissibly suggestive. Niess stresses that the police failed to follow
U.S. Department of Justice guidelines in conducting the pretrial photographic identification. (6)
Specifically, Niess argues that the conduct of the pretrial identification procedure was impermissibly
suggestive because, in compiling the array, the police improperly sought other images that matched
Niess rather than the descriptions given by the victims. Niess also complains that the identification
was not conducted in a "double-blind" manner, such that the officer conducting the procedure did
not know the identity of the suspect. In addition, Niess argues that APD failed to admonish the
witnesses prior to viewing the photos that it was as important to exclude the innocent as to identify
the guilty and that the investigation would continue regardless of any identification they made in the
process. Niess complains that the identification procedures were not videotaped and that APD has
no standard policy for conducting photo identifications and that the police should have conducted
a live lineup instead of a photo array because all of the suspects were already in custody at the time.

 However, Niess fails to explain how the procedures that he complains of were
suggestive and he cites no authority in support of his contention. See Pacheco v. State, No. 04-06-00453-CR, 2007 Tex. App. LEXIS 2744, at *11 (Tex. App.--San Antonio Apr. 11, 2007, pet. ref'd)
(mem. op., not designated for publication) (rejecting claim that identification procedure was
suggestive because police failed to follow U.S. Department of Justice guidelines, noting that
appellant failed to provide any authority that techniques were required). While arguably several
of the procedures that Niess criticizes are more likely to lead to an impermissibly suggestive
identification, he has failed to demonstrate that the procedures necessarily led to an impermissibly
suggestive line up in this case. For example, while conducting the pretrial photo identification in
a "double-blind" manner might minimize the likelihood of impermissible suggestion on the part
of the administering officer, without additional evidence that the officer in fact acted improperly
in administering the test, such evidence fails to demonstrate that Niess's due process rights
were violated.

 At the hearing on Niess's motion to suppress, Detective Phillip Hogue testified
with regard to how the photo array was compiled and administered. Hogue testified that, using a
computer program that shows booking photos, he obtained Niess's most recent booking photo; he
then used the photo to compile a line-up, "looking for five other people that matched similar
descriptions, builds, facial characteristics of the suspect." Prior to being shown the photos, each
witness was read a written admonishment stating:

 

 This group of photos may or may not contain a picture of the person or persons who
committed the crime now being investigated. Keep in mind that hairstyles, beards
and moustaches may be easily changed. Also, photographs may not always depict
the true complexion of a person- it may be lighter or darker than shown in the photo.
Pay no attention to any markings or numbers that may appear on the photo or any
other differences in the type of style of the photographs.

 


Hogue sequentially showed each of the six photos to each witness separately and at separate
times, and he testified that he did not in any way suggest which photo the witnesses should select.
Based on the record before us, we cannot conclude that there was anything impermissibly
suggestive about the manner in which the pretrial photo identification was conducted. See Mayes v.
State, Nos. 03-10-00101-CR, 03-10-00102-CR, 2011 Tex. App. LEXIS 2075, at *15-16 (Tex.
App.--Austin, Mar. 18, 2011, no pet.) (mem. op., not designated for publication) (noting that exact
same admonishment was given to victims and concluding that record did not demonstrate that
there was anything impermissibly suggestive about manner in which pretrial photo identification
procedure was conducted).

 Similarly, after viewing the array of photographs from which Niess was selected, we
cannot conclude that the resulting photo array itself was impermissibly suggestive. Niess complains
that the photo array depicts individuals with different hair styles and facial hair than Niess; with
different scars and tattoos than Niess; with different backgrounds and clothing than Niess; and with
different races than Niess.

 In this case, several of the victims described the assailant with the shotgun as a
heavyset Anglo or partially Hispanic male. After reviewing the individual photos in the array from
which Niess was selected, we find that the photos depict Hispanic and white males of similar
complexion and of approximately the same age and build. All of the men in the array have close-cropped hair styles and light facial hair. In addition, all of the men depicted in the array are wearing
crew-neck t-shirts against substantially similar, plain backgrounds. See Mungia v. State, 911 S.W.2d
164, 168 (Tex. App.--Corpus Christi 1995, no pet.) (noting that differences in shirt color or
photograph background were insignificant and not suggestive). Although only the photograph of
Niess depicts a small tattoo and only one photograph in the array depicts a man with a scar, we find
that these differences do not render the photo array impermissibly suggestive. At the suppression
hearing, Hogue testified that none of the witnesses had mentioned a scar or a tattoo during the
pretrial identification procedure, and there was no evidence presented at the suppression hearing
suggesting that any witness had informed police that one of the assailants had a tattoo. See Escovedo
v. State, 902 S.W.2d 109, 118 (Tex. App.--Houston [1st Dist.] 1995, pet. ref'd) (noting that due
process does not require that all individuals in pretrial identification array be identical and fact that
only one other photograph in array had tattoo tear drop on face did not render the array impermissibly
suggestive); see also Garza v. State, No. 03-06-00216, 2008 Tex. App. LEXIS 7004, at *6-7 (Tex.
App.--Austin Sept. 19, 2008, no pet.) (mem. op., not designated for publication) (concluding that
digitally added tattoo did not render photo array impermissibly suggestive and noting that officer
testified that witnesses had not commented on tattoo when viewing photos or in identifying appellant).

 We hold that Niess has failed to establish that the pretrial identification procedures
were impermissibly suggestive. We therefore need not address whether those procedures created
a substantial likelihood of misidentification. See Tex. R. App. P. 47.1 (court of appeals must hand
down opinions that are as brief as possible while addressing those issues necessary to a final
disposition). See also Loserth, 963 S.W.2d at 772. We overrule Niess's first and second issues
on appeal.

Motion for Mistrial

 In his third issue, Niess contends that the trial court abused its discretion in refusing
to grant a mistrial after a witness testified that Niess "had been to jail before." On direct examination by the State, Erin Moody, who had stayed behind when Niess
and the other men left the Rodriguez house, discussed the events of April 17, 2010. Erin testified
that she had fallen asleep after the men left and then woke around 5:30 a.m., only to find that the
men were still gone. In testifying about her efforts to find the men, the following exchange occurred:

 PROSECUTOR: So what else did you do?

 MOODY: I thought they got arrested so I called the jail, and me and
Kaitlyn left the house.

 PROSECUTOR: Why did you think that they had gotten arrested?

 MOODY: Because they have all been to jail before.


Niess's attorney immediately objected, and upon the court's sustaining his objection, moved for a
mistrial. The trial court denied Niess's motion for a mistrial, but instructed the jury to ignore the
witness's comment. Niess now argues that Erin's testimony was prejudicial because it implied that
Niess and the other men "were a gang of outlaws" and that the only appropriate remedy was for the
court to grant a mistrial.

 We review a denial of a motion for mistrial for an abuse of discretion. Simpson v.
State, 119 S.W.3d 262, 272 (Tex. Crim. App. 2003). A mistrial is the trial court's remedy for
improper conduct that is "so prejudicial that expenditure of further time and expense would be
wasteful and futile." Hawkins v. State, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004). In general,
improper witness testimony, such as a witness's inadvertent testimony referring to or implying
extraneous offenses, can be rendered harmless by a prompt instruction to disregard. Simpson, 119
S.W.3d at 272; Kemp v. State, 846 S.W.2d 289, 308 (Tex. Crim. App. 1992). Exception to this
general rule exists only in those extreme cases where it appears that the testimony was "clearly
calculated to inflame the minds of the jury or was of such damning character as to suggest that
it would be impossible to remove the harmful impression from the jury's mind." Rojas v. State,
986 S.W.2d 241, 250 (Tex. Crim. App. 1998).

 Assuming that the testimony at issue was improper, the record shows that the trial
court immediately instructed the jury to disregard it. Further, there is no evidence suggesting that
the jury was unable to comply with that instruction. Viewing the record in the light most favorable
to the trial court's ruling, we find that the trial court could have reasonably concluded that Erin's
testimony was not so inflammatory as to be incurable by instruction. Accordingly, we cannot conclude
that the trial court abused its discretion in denying Niess's motion for a mistrial. We overrule
Niess's third issue on appeal.


Judgment Modification

 Finally, we address Niess's contention that the judgment in trial court cause number
D-1-DC-10-900336 should be corrected. Specifically, Niess argues that the judgment of conviction
in this cause incorrectly reflects a finding of guilt and a corresponding thirty-year sentence with
respect to count three, concerning Ramiro Garcia. Niess requests that we modify the judgment to
properly reflect that he was acquitted of this count. The State agrees that we should modify the
judgment as Niess requests.

 If the oral pronouncement of a sentence and the written judgment vary or conflict,
the oral pronouncement controls. Thompson v. State, 108 S.W.3d 287, 290 (Tex. Crim. App. 2003).
Here, the record shows that after both sides had rested and closed, Niess moved for an instructed
verdict with respect to the count concerning Ramiro Garcia. The trial court granted the motion,
stating, "You have a request for an instructed verdict as to cause number D-1-DC-10-900336,
count three, alleging an offense against Ramiro Ramirez Garcia is granted. There will not be a
submission, and the Court finds jeopardy has attached and so it will show acquittal." Having
reviewed the record, we agree that the record establishes that Niess was acquitted of count three in
cause number D-1-DC-10-900336. Because the judgment of conviction incorrectly reflects that
Niess was found guilty of this count, we sustain his fourth issue on appeal.

 An appellate court has the power to correct certain clerical errors in a trial court's
judgment if the appellate court has the information necessary to do so. Tex. R. App. P. 43.2.(b);
French v. State, 830 S.W.2d 607, 609 (Tex. Crim. App. 1992); see also Boone v. State, No. 03-10-00440-CR, 2011 Tex. App. LEXIS 5957, at *1 (Tex. App.--Austin July 28, 2011, no pet.) (mem.
op., not designated for publication). We conclude that we have the necessary information to correct
the error in the trial court's judgment in this case. See Thompson, 108 S.W.2d at 290 (noting that
remedy when written judgment conflicts with oral pronouncement is to correct written judgment).
Having sustained Niess's fourth issue on appeal, we modify the trial court's judgment adjudicating
guilt as to count three in trial court cause number D-1-DC-10-900336 to reflect that Niess was
acquitted of this count.

CONCLUSION

 We have overruled Niess's first, second, and third issues on appeal and sustained
Niess's fourth issue on appeal, requesting that we modify one of the judgments of conviction.
Accordingly, the judgment of conviction with respect to cause number D-1-DC-10-900336 is
affirmed as modified, and the remaining judgments of conviction are affirmed.


 __________________________________________

 Diane M. Henson, Justice

Before Justices Puryear, Henson and Goodwin

NO. 03-11-00213-CR Affirmed

NO. 03-11-00214-CR Affirmed

NO. 03-11-00215-CR Affirmed

NO. 03-11-00216-CR Affirmed

NO. 03-11-00217-CR Modified and, As Modified, Affirmed


Filed: June 21, 2012

Do Not Publish
1. Though Niess raises these arguments in thirteen separate points of error, for convenience
we have grouped the points of error into four legal issues on appeal.
2. Unless otherwise noted, the facts recited herein are taken from the testimony and exhibits
admitted at trial.
3. Because many of the people involved in the events leading to Niess's arrest have the
same last name, to avoid confusion we will refer to everyone involved by their first name, with the
exception of appellant, whom we will refer to as "Niess."
4. At trial, Deputy Coleman explained that a request for a "ping" is made to the cell phone
provider and that this "ping" enables authorities, through the use of GPS technology, to determine
the location of a cell phone or its direction of travel.
5. A pretrial photographic identification or "photo array" or "photo spread" occurs when
police show a witness photographs of various persons and ask the witness if anyone in the display
was the person who committed the offense and, if so, to select the perpetrator's photograph. See,
e.g., Coleman v. State, 760 S.W.2d 356, 359 (Tex. App.--Houston [1st Dist.] 1988, pet. ref'd). A
lineup is another type of pretrial identification procedure that occurs when police allow a witness to
consider a group of people and ask the witness to identify whether the perpetrator is in the group.
See, e.g., United States v. Wade, 388 U.S. 218 (1967).
6. At the suppression hearing, the trial court admitted as an exhibit a document entitled
Eyewitness Evidence, A Guide for Law Enforcement, published in October 2009 by the U.S.
Department of Justice, Office of Justice Programs. In part, the document provides recommended
procedures for composing and conducting pretrial identifications. See http://www.nij.gov/pubs-sum/178240.htm (last visited May 25, 2012).